ELMORE, Judge.
 

 *59
 
 Michael Teon Brown ("defendant") appeals from judgment entered upon jury verdicts finding him guilty of two counts of first-degree murder. On appeal, defendant challenges the admission of several out-of-court statements made by two of the State's witnesses. Specifically, defendant contends the trial court erred by allowing two prior written statements to be read to the jury as substantive evidence, and by allowing the jury to view one witness's videotaped statement as illustrative evidence, because all three statements constituted inadmissible hearsay. After careful review, we conclude that defendant received a fair trial, free from error.
 

 I.
 

 On 6 January 2014, a grand jury returned two indictments charging defendant with the murders of his child's mother, Jessica Liriano, as well as Jessica's boyfriend, Jerron McGirt. The evidence tended to show that the victims had been fatally shot with a .45 caliber handgun outside of their Durham home at approximately 7:00 a.m. on 16 December 2013. No physical evidence was found directly linking defendant to the crime scene; thus, the State's case relied primarily on the testimony of multiple witnesses, including defendant's two brothers, Reginald and Antonio Brown.
 

 The murder charges against defendant were joined for trial, which began on 25 July 2016-nearly three years after the relevant events occurred. Defendant elected not to testify or offer any evidence at trial, while
 
 *226
 
 the State called Reginald and Antonio as witnesses on 27 July 2016.
 

 Reginald's Testimony
 

 On direct examination, Reginald testified that defendant, who lived in Hartsville, South Carolina, drove to Reginald's home in Cheraw, South Carolina, on the morning of 16 December 2013. Reginald testified defendant informed him upon arrival that Jessica and her boyfriend had been murdered. The following exchange then took place between Reginald and the State:
 

 *60
 
 Q. What did [defendant] tell you that morning?
 

 A. He came and told me that he seen that, what happened up here [in Durham], on the internet.
 

 ....
 

 Q. The only thing that-you're telling us right now the only thing that he said to you was something about the murder that he saw on the internet?
 

 A. Yes.
 

 ....
 

 Q. Did you ask him if he knew anything about it?
 

 A. Yes.
 

 Q. And what did he say?
 

 A. He told me that he did it. And he came out with a beer bottle in his hand, with beer, and acted like he was drinking all night.
 

 Q. So when he told you-when you asked him about it, what did he tell you?
 

 A. He told me he was the one that did it. But-
 

 ....
 

 Q. What else did he tell you about it?
 

 A. That was it.
 

 Following this exchange, Reginald testified that either Antonio or the brothers' mother called the police on the night of 16 December 2013; that Reginald, Antonio, and their mother went to the Cheraw Police Department sometime after the phone call was made; and that Reginald spoke with an investigator there and gave him a detailed, handwritten statement regarding what defendant had told Reginald about the murders. Reginald also confirmed that both audio and video from his interview with the investigator had been recorded and stored in DVD format.
 

 Reginald's Out-of-Court Statements
 

 As to Reginald's written statement, the State established that Reginald recognized the document based on his handwriting and signature; that it was dated 17 December 2013; and that it did not appear to have been changed or manipulated in any way since Reginald last saw it. The State then moved to admit Reginald's statement into evidence, prompting defendant to request that the court give a limiting instruction that "the statement is admitted only to the extent it corroborates or impeaches the witness's testimony." The court replied simply, "It's
 
 *61
 
 his statement," with no further discussion on the matter. At the State's request, Reginald proceeded to read his written statement aloud to the jury.
 

 My name is Reginald Brown. I'm here to tell that my brother did a crime. He told me that he killed someone in the North Carolina area on December 16 at that morning. He told me that he used a .45 handgun. Also he told me that-that he waited-waited till the kids got on the bus to kill them. He was wearing a black hoodie, black pants, black shoes. He also told me not to tell anyone. He was driving a Chevy Caprice. He told me that he killed his baby mama-mother and her boyfriend. He told me that he was waiting under some box.
 

 After Reginald finished reading and again confirmed that he had written the statement, the State immediately moved on to address Reginald's videotaped interview. The State established that Reginald recognized the DVD as a recording he had previously watched in its entirety; that his initials appeared on the face of the disk; that it contained his interview with the investigator; and that it fairly and accurately captured his conversation with the investigator. The following dialogue then took place in the presence of the jury:
 

 [THE STATE]: Your Honor, I move to introduce and publish [the DVD].
 

 *227
 
 THE COURT: [The DVD] is admitted for illustration.
 

 [DEFENDANT]: Your Honor, I would again object under the hearsay rule and I would object that this is being offered to prove the truth of the matter asserted. I'd ask [for] a limiting instruction.
 

 THE COURT: All right. It is overruled. Ladies and gentlemen, this [DVD] is being admitted for illustrative purposes. That means it's being admitted for the limited purpose of illustrating the defendant's-excuse me-illustrating the witness's testimony under oath at this trial. If you believe that this earlier matter for illustrative purposes was made, you may consider it, but only for the limited purpose of deciding whether it illustrates his testimony at this trial and not for any other purpose. Thank you, ladies and gentlemen.
 

 [DEFENDANT]: Just for clarity, Your Honor. I believe you're denying it. I would ask [that] a limiting instruction
 
 *62
 
 be given that they only be allowed to consider this to the extent it corroborates or impeaches his testimony.
 

 THE COURT: I'll stick with my instruction. Thank you, sir.
 

 The State proceeded to play the DVD for the jury. Consistent with his written statement, Reginald stated in his recorded interview that defendant had told Reginald he had killed Jessica and her boyfriend with a .45 caliber handgun, after waiting under a box on her porch until her older children left for school, but he added that defendant had left for Durham around 1:00 a.m. on 16 December 2013, and that defendant had actually shown Reginald the gun used in the murders. When the investigator asked him about the gun, Reginald repeatedly claimed that the brothers' cousin, Lorenzo Brown, now had the gun. As he had indicated in his testimony, Reginald stated in his recorded interview that "[defendant] never really got down to the details about why he did it. He just said he really did it."
 

 On cross-examination, Reginald testified that he never saw defendant with a gun. Reginald's testimony ended with the following exchange on redirect examination by the State:
 

 Q. When you talked to [the investigator] and when you wrote your statement, you were trying to give him all the information that you had?
 

 A. That was all the information that I had that I wrote down.
 

 Q. And what you told him?
 

 A. Yeah. No, the information I wrote down, that's ... the information that my brother had told me.
 

 Q. Okay.
 

 A. The stuff I didn't write down was not true.
 

 Antonio's Testimony
 

 On direct examination, Antonio stated that he drove to Reginald's home around 10:00 a.m. on 16 December 2013, and that defendant was still there when he arrived. Antonio testified that defendant told him that Jessica and her boyfriend had been murdered, but that defendant did not "say anything about having a role in that." The following exchange then took place between Antonio and the State:
 

 Q. Okay. Are you saying that your brother didn't describe his role in [the murders] to you?
 

 *63
 
 A. He-he was saying-he was saying it was stuff like-what happened down here, but he-I wrote in my statement, but what he saying-that what he said, I just-I just telling y'all 'cause I was scared. I didn't want to be an accessory or nothing.
 

 Q. What made you think that you would be an accessory of something?
 

 A. 'Cause if I didn't told, I probably would have been in jail.
 

 Antonio further testified that he then drove defendant, who Antonio thought was too
 
 *228
 
 drunk to drive, to their cousin Lorenzo's home in Hartsville so that defendant could buy marijuana. When asked, "[Defendant] didn't say he had to take something back to Lorenzo?," Antonio replied, "No. 'Cause I spoke with Lorenzo ... and I tried to see what was the situation about the whole gun thing. He wouldn't tell me nothing. All he said was that [defendant] bought weed from him."
 

 Antonio's Out-of-Court Statement
 

 After Antonio denied that defendant had told him he was returning something to Lorenzo, the following exchange took place between Antonio and the State:
 

 Q. You mentioned-you mentioned your [written] statement before. If you said something different in your statement that you wrote-
 

 A. That was about three years ago. I really-I really can't think of it back then.
 

 Q. Well, do you think you would have remembered things the day after they happened more clearly than you do today?
 

 A. Huh-uh. I be having a lot of stuff going on.
 

 Q. Okay.
 

 A. I can read what I said in that statement.
 

 Antonio then confirmed that his mother had called the police department on 16 December 2013; that he later went to the Cheraw Police Department, where he spoke to an investigator; and that he had given the investigator a written statement. Relevant excerpts from this portion of Antonio's testimony include the following:
 

 Q. And did you tell [the investigator] what you knew?
 

 *64
 
 A. Yeah, I told him what-yeah, what [defendant] told me. [Defendant] be saying all kinds of stuff when he drunk and stuff so I took it serious and went and told 'cause I ain't trying to be in trouble or nothing.
 

 Q. Because you didn't want to be in trouble, you were trying to tell [the investigator] everything that you knew?
 

 A. Yeah. Everything that I knew that what he said on the statement.
 

 The State approached Antonio with an exhibit and established that Antonio recognized it as his written statement based on his handwriting and signature; that it was dated 17 December 2013; and that it did not appear to have been changed or altered in any way. The State then moved to admit Antonio's statement into evidence, prompting defendant to again "object just to the extent it's offered to prove the truth of the matter asserted and ask for a limiting instruction."
 

 The trial court excused the jury following defendant's objection. Outside of the jury's presence, defendant argued that both Reginald and Antonio's written statements were hearsay, because they were not made while the witnesses were testifying at trial, and that the State had failed to lay a proper foundation for admission of the statements under the hearsay exception for recorded recollections. Specifically, defendant asserted that the State had failed to establish that either witness had an insufficient recollection of what defendant told him on 16 December 2013, as each witness had testified to what defendant told him that day, and neither witness had claimed in his testimony to not remember what defendant said. Defendant also argued that the State was improperly impeaching its own witness by introducing a prior statement that the State knew to be inconsistent with the witness's testimony.
 

 In response to defendant's arguments, the court made the following oral findings of fact and legal conclusions regarding the witnesses' testimony and the various out-of-court statements: (1) that defendant's out-of-court statement to Reginald-that "[defendant] told [Reginald] that he did it"-was admissible via Reginald's testimony as a statement of a party-opponent; (2) that defendant's more detailed out-of-court statements were recorded in Reginald and Antonio's written statements at a time when defendant's statements were fresh in the witnesses' memories; (3) that based on both witnesses' testimonies-particularly Antonio's testimony that three years had passed and he has "a lot of stuff going on"-the witnesses had an insufficient recollection
 
 *229
 
 of what
 
 *65
 
 they wrote down for the investigator on 17 December 2013; (4) that the witnesses testified that they did, in fact, write down for the investigator what defendant said on 16 December 2013; (5) that this was "a case of a witness who's talking about events three years later," not of the State impeaching its own witness; and (6) that both written statements-presuming they constitute hearsay, which the court questioned-fit within the hearsay exception for recorded recollections under Rule 803(5) of the Rules of Evidence. The court then overruled defendant's objection, denied his request for a limiting instruction, and allowed Antonio's written statement to be read to the jury.
 

 In his written statement, Antonio indicated that defendant told Antonio, "I killed both of them. ... my baby mama and her boyfriend"; that defendant "showed [Antonio] on the internet that he killed them"; that defendant said, "I was waiting on the porch for three hours until she put her kids on the bus and I shot them"; and that defendant "got [Antonio] to take to him to Hartsville to bring [their] cousin Lorenzo Brown back the gun he killed the two people with."
 

 On cross-examination, Antonio testified that he never saw a gun. Antonio's testimony ended with the following exchange on redirect examination by the State:
 

 Q.... [I]s is fair to say that you'd do what you could to help your brother out?
 

 A. You say I do what I-yeah. I'm saying-but this stuff I wrote, though, he was drunk. I just telling you what-yeah, I wouldn't-I wouldn't lie for him or nothing, but yeah.
 

 Q. So what you wrote in your statement is what you heard [defendant] say on the 16th?
 

 A. Yeah. When he was drunk and stuff, what he say.
 

 Additional Evidence
 

 Additional evidence presented at trial tended to show the following:
 

 Durham police officers responding to the crime scene on the morning of 16 December 2013 canvassed the neighborhood for witnesses. Several of Jessica's neighbors reported hearing gunshots around the time the high school bus came, which was before 7:00 a.m.
 

 Investigators recovered eight latent fingerprint lifts and collected swabs for DNA testing from the crime scene. None of the fingerprints
 
 *66
 
 matched those of defendant, Jessica, or her boyfriend, and none of the DNA profiles matched that of defendant.
 

 With the aid of a metal detector, investigators recovered seven spent .45 caliber shell casings from Jessica's front yard.
 

 On 31 December 2013, Hartsville police officers apprehended defendant's cousin, Lorenzo Brown, and retrieved a .45 caliber handgun from his person.
 

 A forensic firearms analyst compared the markings of test shell casings from the handgun retrieved from Lorenzo to six of the seven spent shell casings collected from the crime scene. In the analyst's expert opinion, the markings matched.
 

 Outcome at Trial
 

 Before the State rested, defendant renewed his objection to Reginald and Antonio's written statements being admitted as substantive evidence, while the State requested that Reginald's videotaped statement be admitted for both illustrative and substantive purposes. The trial court reiterated that the two written statements were admissible as recorded recollections under Rule 803(5) of the Rules of Evidence ; instructed the State that it could read the statements to the jury, but could not provide the jury with physical copies of the statements; and denied defendant's request for a limiting instruction. As to Reginald's videotaped statement, the court again deemed the recorded interview to be illustrative evidence, and it denied the State's request that the statement also be admitted for substantive purposes.
 

 During the charge conference, the court indicated that it would instruct the jury on "photographs and videos as illustrative evidence" as well as "impeachment or corroboration by prior statement." The court subsequently instructed the jury that
 
 *230
 
 "[p]hotographs and video, specifically the video of Reginald Brown, were introduced into evidence in this case for the purpose of illustrating and explaining the testimony of a witness or witnesses. These photographs and videos may not be considered by you for any other purpose." The court also instructed the jury that
 

 Evidence has been received tending to show that at an earlier time a witness made a statement which may conflict with or be consistent with the testimony of the witness at this trial. You must not consider such earlier statement as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial. If you believe the earlier statement was made, and that it
 
 *67
 
 conflicts with or is consistent with the testimony of the witness at this trial, you may consider this and all other facts and circumstances bearing upon the witness's truthfulness in deciding whether to believe or disbelieve the witness's testimony.
 

 On 2 August 2016, the jury returned verdicts finding defendant guilty of two counts of first-degree murder, and he was sentenced to life imprisonment without parole for each. Defendant entered notice of appeal in open court.
 

 II.
 

 On appeal, defendant contends that the trial court violated the evidentiary rule against hearsay by admitting Reginald and Antonio's prior written statements as substantive evidence, and by admitting Reginald's videotaped statement as illustrative evidence.
 
 [1]
 
 Defendant argues that these erroneously-admitted statements served as the "linchpin" of the State's case against him, and that a reasonable possibility exists that the jury would have reached a different result had the statements been excluded. For these reasons, defendant asserts that his convictions must be reversed and his case remanded for a new trial.
 

 Each assignment of error is addressed in turn.
 

 Admission of Prior Written Statements
 

 Defendant first contends that the two prior written statements should not have been read to the jury because the State failed to lay a proper foundation for admission pursuant to the recorded recollections exception to the rule against hearsay under Rule 803(5) of the Rules of Evidence. We disagree.
 

 Hearsay is "a statement, other than one made by the declarant
 
 while
 
 testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted [in that statement]." N.C. Gen. Stat. § 8C-1, Rule 801(c) (2015) (emphasis added). "Hearsay is not admissible except as provided by statute or by [the evidentiary] rules." N.C. Gen. Stat. § 8C-1, Rule 802 (2015). Rule 801(d), for example, provides that a defendant's own out-of-court statement is admissible when offered against him at trial, while Rule 803 sets forth numerous exceptions to the rule
 
 *68
 
 against hearsay when certain conditions are met. N.C. Gen. Stat. §§ 8C-1, Rules 801(d), 803 (2015).
 

 Initially, we must note that defendant is correct in maintaining that the two prior statements at issue here constituted hearsay. Regardless of the fact that the declarants, Reginald and Antonio, were witnesses testifying at trial, their written statements were not made
 
 while
 
 testifying at trial; rather, they were made at a police department in South Carolina nearly three years prior to trial. Thus, the statements were inadmissible as substantive evidence-that is, for their truth value-unless they fit within an exception to the rule against hearsay.
 

 Rule 803 of the Rules of Evidence provides that one type of out-of-court statement, labeled a "recorded recollection," is admissible as an exception to the rule against hearsay. Specifically, Rule 803(5) allows a memorandum or record of an event to be read into evidence where (1) the witness once had knowledge about the matters he recorded,
 
 *231
 
 (2) the witness now has insufficient recollection to enable him to testify fully and accurately about those matters, and (3) the record was made or adopted by the witness at a time when the matters were fresh in his memory and reflected his knowledge correctly. N.C. Gen. Stat. § 8C-1, Rule 803(5). "The rule applies in an instance where a witness is unable to remember the events which were recorded, but the witness recalls having made the entry at a time when the fact was fresh in her memory, and the witness knew she recorded it correctly."
 
 State v. Spinks
 
 ,
 
 136 N.C. App. 153
 
 , 158-59,
 
 523 S.E.2d 129
 
 , 133 (1999) (holding that witness's recorded statement should not have been read into evidence where witness did not write statement herself, and testified, "I didn't even read it. I just signed this piece of paper.").
 

 "We review
 
 de novo
 
 the trial court's determination of whether an out-of-court statement is admissible pursuant to N.C. R. Evid. Rule 803."
 
 State v. Wilson
 
 ,
 
 197 N.C. App. 154
 
 , 159,
 
 676 S.E.2d 512
 
 , 515 (2009). Thus, whether a prior written statement is admissible as substantive evidence under Rule 803(5)'s hearsay exception for recorded recollections is a question of law that is reviewed by this Court as if we were considering the issue for the first time. However, a trial court's findings of fact are binding on appeal when supported by any competent evidence.
 
 State v. Ross
 
 ,
 
 329 N.C. 108
 
 , 123,
 
 405 S.E.2d 158
 
 , 167 (1991).
 

 Here, although the trial court initially questioned whether the prior written statements constituted hearsay, it concluded that the statements were nevertheless admissible pursuant to the hearsay exception for recorded recollections under Rule 803(5). As to Rule 803(5)'s
 
 *69
 
 foundational requirements, the court found that on 17 December 2013, when the matters were still fresh in their memories, the witnesses wrote down what defendant told them on 16 December 2013. The court also found that based on their testimonies as well as the substantial amount of time that had passed since they recorded their statements, the witnesses had insufficient recollections as to the matters they recorded. Pursuant to the additional provisions of Rule 803(5), the court allowed the statements to be read into evidence, but it denied the State's attempt to distribute physical copies of the statements to the jury.
 

 In asserting that the trial court erred in admitting the statements as recorded recollections under Rule 803(5), defendant contends for the first time on appeal that the State failed to establish that the written statements correctly reflected the witnesses' prior knowledge of the matters recorded therein. Defendant maintains his argument that the State also failed to establish that the witnesses had insufficient recollections about the matters recorded, while he abandons his objection at trial to the extent that it was based on improper impeachment by the State.
 

 As to defendant's argument regarding the accuracy of the prior written statements, we first note that defendant did not lodge an objection at trial on that particular basis.
 
 See
 
 N.C. R. App. P. 10(a)(1) ;
 
 see also
 

 Weil v. Herring
 
 ,
 
 207 N.C. 6
 
 , 10,
 
 175 S.E. 836
 
 , 838 (1934) ("[T]he law does not permit parties to swap horses between courts in order to get a better mount ...."). Nevertheless, even a cursory review of the record on appeal reveals that defendant's contention is meritless.
 

 Prior to reading his statement, each witness testified on direct examination that he recalled giving a written statement to the investigator; that he recognized the document presented by the State as being that statement; that he recognized his own handwriting and signature on that statement; and that the statement, dated 17 December 2013, did not appear to have been changed or manipulated in any way. Additionally, after Reginald read his statement, the State specifically asked him, "Was that the statement you wrote?," to which he responded, "Yes, sir." Reginald further testified, on redirect, that he wrote down all the information that he had at that time, and that the information he wrote down was what defendant had told him. Similarly, Antonio testified on direct examination that he tried to write down everything that he knew defendant had said. After he read his statement, Antonio confirmed on redirect that what he wrote in his
 
 *232
 
 statement was what he heard defendant say on 16 December 2013.
 
 *70
 
 Based on the foregoing testimony, we conclude that the State properly established that the written statements correctly reflected the witnesses' prior knowledge of the matters recorded therein, and defendant's argument to the contrary is overruled.
 

 Defendant also contends that the State failed to establish that Reginald and Antonio had insufficient recollections about the matters recorded in their prior statements. He argues that neither witness testified to not remembering what defendant told him on 16 December 2013, which defendant asserts is a necessary component of Rule 803(5)'s foundational requirements. We disagree.
 

 Rule 803(5) requires only that a witness's recollection be insufficient "to enable him to testify
 
 fully and accurately
 
 " about the matters he previously recorded. N.C. Gen. Stat. § 8C-1, Rule 803(5) (emphasis added). In determining if a witness's recollection is sufficiently exhausted for purposes of Rule 803(5), the relevant inquiry is "whether the witness is using the memorandum as a testimonial crutch for something
 
 beyond
 
 his recall."
 
 State v. York
 
 ,
 
 347 N.C. 79
 
 , 89,
 
 489 S.E.2d 380
 
 , 386 (1997) (emphasis added).
 

 The testimonies of both Reginald and Antonio leading up to the introduction of their prior written statements show that this evidence was necessary "as a testimonial crutch for something beyond [their] recall."
 

 Id.
 

 Each witness established that he wrote his statement on 17 December 2013-nearly three years prior to trial. On direct examination, Reginald could not recall numerous details surrounding the events of that date, including what time defendant came to his home on the morning of 16 December 2013, which family member initially called the police, which police department had been called, and exactly what day he spoke to an investigator at the Cheraw Police Department. Although Reginald testified that "[defendant] told me that he did it" and "[defendant] told me he was the one that did it," it is apparent that he was unable to testify fully and accurately regarding that conversation, while Antonio explicitly testified that his statement was written "about three years ago" and he "really can't think of it back then."
 

 Based on the foregoing testimony, the trial court found that each witness had an insufficient recollection of the matters recorded in his statement. The trial court's findings were based on competent evidence and support the conclusion that the prior written statements fit within the hearsay exception for recorded recollections. Accordingly, defendant's argument that the State failed to lay a proper foundation for admissibility under Rule 803(5) is overruled.
 

 *71
 

 Admission of Videotaped Statement
 

 Despite the fact that it was not admitted as substantive evidence, defendant argues that the trial court erred by admitting Reginald's videotaped statement as illustrative evidence because-like the two prior written statements-the videotaped statement constituted inadmissible hearsay. We disagree.
 

 On appeal, defendant fails to distinguish his argument regarding the videotaped statement from his argument regarding the written statements, ignoring the fact that the trial court twice issued a limiting instruction as to the former. Specifically, the court instructed the jury during trial that the DVD was being admitted for the limited, non-hearsay purpose of illustrating Reginald's testimony. At the end of trial, the court again instructed the jury that the videotaped statement may not be considered for any purpose other than illustration, and that the prior statements of witnesses in general should not be considered "as evidence of the truth of what was said" in those statements. Thus, because the videotaped statement was not admitted for substantive purposes, defendant cannot rely solely on his hearsay argument as to the prior written statements in contending that the court likewise erred in admitting Reginald's videotaped statement.
 

 "We have long held that a jury is presumed to follow the instructions given to it by the trial court."
 
 State v. Hyatt
 
 ,
 
 355 N.C. 642
 
 , 663,
 
 566 S.E.2d 61
 
 , 75 (2002). Further, "the ruling of the court below in the consideration
 
 *233
 
 of an appeal therefrom is presumed to be correct."
 
 Beaman v. Southern Ry. Co.
 
 ,
 
 238 N.C. 418
 
 , 420,
 
 78 S.E.2d 182
 
 , 184 (1953) (citations and quotation marks omitted). Because we presume that the jury did not consider the videotaped statement as substantive evidence, and because defendant has failed to submit a cohesive argument or to cite to any legal authority for the proposition that the trial court erred in admitting the DVD for the limited, non-hearsay purpose of illustrating Reginald's testimony, defendant's assignment of error is overruled.
 

 III.
 

 Because the two prior written statements were properly read to the jury pursuant to the hearsay exception for recorded recollections under Rule 803(5), and because defendant has failed to allege an independent argument regarding the admissibility of the videotaped statement as illustrative evidence, we hold that the trial court did not err in admitting the out-of-court statements into evidence. We also note that defendant did not challenge Reginald's testimony that "[defendant] told [him] that he did it" and "[defendant] told [him] he was the one that did it," which
 
 *72
 
 the trial court properly allowed as an admission of a party opponent pursuant to N.C. Gen. Stat. § 8C-1, Rule 801(d). For the reasons stated herein, we conclude that defendant received a fair trial, free from error.
 

 NO ERROR.
 

 Judges STROUD and TYSON concur.
 

 [1]
 

 Defendant also asserts that the trial court erred in denying his request for a limiting instruction as to the evidence in question, and that such an error deprived defendant of his constitutional rights to due process and a fair trial. Because defendant fails to address this issue in his brief, it is deemed abandoned on appeal.
 
 See
 
 N.C. R. App. P. 28(b)(6).